Pre' Catelan, Inc., Plaintiff, _v._ International Federation of Workers in the Hotel, Restaurant, Lunch Room, Club, and Catering Industry, and "Louis" Merlen, the First Name "Louis" Being Fictitious, the Real Name Being Unknown to Plaintiff, Individually and as Secretary and Treasurer of International Federation of Workers in the Hotel, Restaurant, Lunch Room, Club and Catering Industry, Defendants.

(Supreme Court, New York Special Term, March, 1921.)

Picketing — right to picket — strikes — labor unions — injunctions.

Injunctions — when motion to continue injunction pendente lite granted — labor unions — picketing — restaurant keepers.

The fundamental thought underlying the judicial decisions by which solely the right to picket was created, was and is that the grant of such right was in furtherance, not of a greater liberty to be exercised by employees out on strike, but for their betterment, if such result could be brought about. It was never intended that the laws of the land should yield in the exercise of the right to picket. (Pp. 668, 669.)

The right to picket, even in an orderly and quiet manner, does not carry with it the privilege of destruction as a means to an end; nor does it, even inferentially, confer the right to unlawfully coerce or oppress. (P. 669.)

Picketing unaccompanied by threats and intimidation is a useless weapon; its effectiveness and its very essence is in the terror it incites. (Id.)

Plaintiff, engaged in the restaurant business and employing approximately a hundred persons in different capacities, has always maintained an "open shop" and has never discriminated against union labor. While its restaurant about ten P. M. was crowded with patrons, who though they had given their orders had not been served, all the waiters without cause or grievance suddenly, without warning or notice, walked out, and on the following day began picketing in front of plaintiff's place of business in squads of from two to fifteen per-

sons, each carrying a sign which read "Workers of Pre' Catelan on strike for better conditions." It appeared by affidavits that as part of a scheme to injure and demoralize plaintiff's business and to produce fear on the part of its employees, some of them were subjected to aggravated assaults and threatened that if they did not cease working for plaintiff and join the union harm would follow; that there were threats of injury to patrons; that in order to protect its employees from harm plaintiff was put to the necessity of carrying them to and from work in taxicabs. It also appeared that agents of defendant, the International Federation of Workers in the hotel, restaurant, etc., industry, had entered plaintiff's premises, blocking the entrance thereto, and had used indecent language to its employees, interfered with them in the discharge of their duties, and followed them to their homes. *Held,* that a motion to continue an injunction *pendente lite* will be granted. (Pp. 663-664, 672.)

Motion to continue an injunction *pendente lite.*

Harry W. Newburger, for plaintiff.

William Karlin, for defendants.

Erlanger, J. The moving papers show that plaintiff is engaged in the restaurant business in which it has invested upwards of $100,000. Its rent is about $25,000 yearly; it employs approximately 100 persons in different capacities, among them a large number of waiters; that it has always maintained an "open shop" and never discriminated against union labor; that the head waiter hired the employees. On February 13, 1921, at about ten P. M. while the restaurant was crowded with patrons who had given their orders but had not yet been served, all the waiters without cause or grievance therefor suddenly and without warning or notice walked out and on the following day began picketing in front of its place of business in groups or squads consisting of from two to fifteen persons; that the latter carry upon their

person a sign which reads " Workers of Pre' Catelan on strike for better conditions," and then there is recited a series of acts of violence and intimidation against its employees and intended patrons so shocking that one is almost stunned at the thought that such occurrences are possible in a civilized country. It is shown that one of the employees is in the Roosevelt Hospital suffering from a fractured nose, blackened eyes and lacerations of the face; that his assailant was arrested and held to bail; that another was attacked almost in front of plaintiff's premises and beaten about the head and face nearly into unconsciousness; that another was kicked in the head and face and is confined to his home as the result of his injuries; that another was knocked down by persons jumping from a taxicab who beat up his head and face and who has since been confined to his home by reason of the assault; that others were called vile names; that a number of patrons have been threatened by the sign bearers with bodily harm if they continued to patronize plaintiff; that other patrons were told that the place was disorderly and was to be raided; that the employees were threatened with harm if they did not quit working for the plaintiff; that the patrolling is for the purpose of intimidating its employees and to induce them to join the union; that agents of the defendants have entered plaintiff's premises and used indecent language to its employees and interfered with them in the discharge of their duties; that the entrance to its premises was blocked, its employees followed to their homes, all which is a part of a scheme to injure and demoralize plaintiff's business and to produce fear on the part of its employees; that the pickets are on duty from eleven A. M. to one A. M.; that to protect its employees they are carried back and forth in taxicabs. The defend-

ants make a sweeping denial of all the charges so made against them. In the opposing papers a history is given of conditions existing in the hotel and restaurant industry showing how bad they were before the association defendant was formed, and the improvement that has taken place from that time on as to wages, hours of work and living conditions; that in 1918 the union presented demands to the plaintiff as to wages, hours of labor and reduction of working days from seven to six and an amicable settlement was attempted, and this being refused a strike was called by the union which lasted only a few hours and finally the demands were granted. Since then and for over two years the relations between plaintiff and the union have been amicable and so continued for over two years. As a result of the agreement the union was permitted by plaintiff to appoint one of its employees as a shop representative whose duty it was to see that the rules of the union and the agreement were enforced. Only members of the union were to be employed; that no employee was to be discharged except for reasonable cause, and in the event of an indiscriminate discharge upon investigation of the union the employee was to be reinstated; that all of plaintiff's employees were members of the union for about three years; that on the day following the strike, defendant's secretary called on plaintiff's secretary and offered to bring about an amicable settlement of the strike; that the former advised the latter that the union had secured information that the plaintiff had employed a crew of non-union men to take the place of the union employees, and if plaintiff would relinquish its plans against the union employees the matter could be settled immediately; that to this a threat to kill was made and that the union would be shot to pieces and smashed if it insisted on main-

taining jurisdiction over plaintiff's place; that all efforts to settle failed; that the cause of the strike was brought about by the employees being informed that it was plaintiff's intention to destroy the organization of its employees and to retain in its employ only such as were willing to give up their union membership; that on the thirteenth day of February a full crew of non-union men was hired and the union employees discharged; that the waiters were " locked out " without any previous notice to them and as a result went on strike; that the pickets were instructed to commit no act of violence or breach of the peace; that no more than two pickets were at any time in front of the premises; that customers were never threatened and no attacks were made by the pickets; that no disorderly act occurred since the strike began; that the relation between plaintiff's customers and the former employees was amicable " and for that reason it must be admitted that perhaps due to the existence of the present strike the plaintiff's place of business might have suffered somewhat, but this is not due to any threats made by the pickets, but to the sympathy of the dining public with the cause of the employees;" that no employees of plaintiff were followed; no taxicabs used, but it is admitted " that some of the strong arm men hired by the plaintiff carried the employees of plaintiff to and from their place of business in taxicabs and these were the only taxicabs used in connection with the strike;" that plaintiff from the beginning of the picketing always had an officer in front of its place and hired men " who are very tough in appearance " who sought quarrels with the pickets. In fine, the contention is that the acts of the pickets were at all times peaceful, and the assaults, if committed, and other disturbances, were the acts of strangers. The affidavit in reply

denies that plaintiff ever had anything but an open shop; that it never had any contract with the union containing any definite conditions; denies any discrimination; that its present employees are non-union men; denies the hiring of any guards or toughs; denies police protection; denies that any threat was made to destroy the organization of its employees; denies any threats to discharge the waiters; that no dispute was ever had with them; that their leaving was a surprise and that it had no prior knowledge of any reason for their action; denies the employment of a crew of non-union men on the thirteenth day of February as claimed, but admits that a new crew was employed within twenty-four hours after the waiters walked out, etc. The foregoing are the salient points which the papers on both sides exhibit and they show how sharp the conflict is on this motion. If mere denials were controlling on applications for injunctions, that writ would seldom issue. It never issues as a matter of course. But a court of equity will not withhold its power in that regard when a *prima facie* case is presented and the exigencies of the situation warrant its action. In the case of *Skolny* v. *Hillman,* 114 Misc. Rep. 571, I said among other things: " It is clearly established that picketing is lawful; that a man may work or not as he shall choose; that he may strike with others and peaceably seek others to join. But it is equally well settled that a worker may work wheresoever it pleases him; that he may labor and provide for himself and family without being subjected to the danger· of assault or threat of bodily harm; that he cannot be compelled to join a union if he is not disposed so to do; that employees may not be enticed from their employment by threats or otherwise." Many of the features in the cited case are present here. Plaintiff insists on an " open

shop.'' The defendants on the other hand want it unionized so that none but union men shall be employed. They are fighting not only for what is known as the '' closed shop '' which excludes all workers not members of the union, but also to maintain in plaintiff's business a '' shop representative '' whose duty it is to see that union rules are enforced and that no one is discharged except for reasonable cause, of which the union is to be the sole judge. That such is their contention is fairly to be inferred from the proof before me. And this, it is plaintiff's claim, is the origin of the trouble. Whether the waiters left voluntarily or were locked out, does not confer upon them the right to injure or destroy. If causelessly discharged, the courts afford them a proper remedy. If to strike and picket means that employers must through violence, intimidation and. threats of destruction of their business yield to the demands which they, the strikers, through their union, shall see fit to impose, that is a direct challenge to existing laws and defies the basic principle of freedom of action, on which our form of government rests. When I said in the cited case that strikes and picketing were lawful, I meant of course those conducted by lawful means. The fact must not be lost sight of, that the right to picket, which is regarded in the eyes of the union as a sacred one, was created by the courts, and solely by them, and it is that tribunal which must correct abuses, if any arise under the determinations made by them. The fundamental .thought underlying such decisions no doubt was, and is, that the grant of such right was in furtherance, not of a greater liberty to be exercised by them, but for the betterment of the worker if such result could be brought about, and to this central idea no one can or will find fault. But it was never intended that the ·

laws of the land shall yield in the performance of that privilege. No court, I venture to say, ever imagined that their declarations of the right to picket would ever be construed to mean that it carried with it the right to inaugurate a reign of terror on either a small or large scale, or if not that, that other members of the public through sympathy may introduce the rule of the mob. To strike and to picket are terms which comprehend much. But there is a vast difference between those terms and license. The prerogative to picket even in an orderly and quiet manner does not carry with it the privilege of destruction as a means to an end. Nor does it even inferentially confer the right to unlawfully coerce or oppress. Picketing unaccompanied by threats and intimidation is a useless weapon. Its effectiveness and its very essence is in the terror that it excites. If done peaceably it would be futile. It follows then that the fear, if not the terror that the picketing carries with it, is the keystone of the arch and the potential element to the success of the cause. We have here established assaults of an aggravated nature; threats to employees if they did not cease working for plaintiff harm would follow; threats of injury to patrons; the necessity of carrying the employees back and forth in taxicabs to protect them from harm. Are all these charges mere fables? Were the assaults and injuries self-inflicted? Is the use of taxicabs to carry the employees back and forth merely a whim? Are employees to be coerced and oppressed by threats of injury and held remediless because forsooth the charges are denied? Is the state to be held so weak that it cannot protect those who desire to work but are fearful of the result if they do? Is a worker to be deprived of the right to live even though he is willing to work for a wage acceptable to him? Or forced to

join a union against his will? If these things are per-
mitted and the courts are to be held powerless to pro-
tect the weak against the strong, then the law is a
mockery. If the claim that ours is a government of
laws and not of men is to be upheld, conduct of the
kind set forth in the moving papers must be dealt with,
and I can find no better expression in that connection
to convey the thought in my mind than that used by
the court in the case of *Curran* v. *Galen,* 152 N. Y. 33–
37, where it was said: " Every citizen is deeply inter-
ested in the strict maintenance of the constitutional
right freely to pursue a lawful avocation, under con-
ditions equal as to all, and to enjoy the fruits of his
labor, without the imposition of any conditions not
required for the general welfare of the community.
The candid mind should shrink from the results of
the operation of the principle contended for here; for
there would certainly be a compulsion, or a fettering,
of the individual, glaringly at variance with that free-
dom in the pursuit of happiness, which is believed to
be guaranteed to all by the provisions of the funda-
mental law of the state."

I am not unmindful of the rulings of the courts of
our state on the subject of strikes and picketing. They
exist in abundance, but in none that have been
examined by me were the acts chargeable to the
defendants here ever sanctioned. The terms, *threats,
coercion, oppression, intimidation,* and perhaps others,
have all been passed upon. It is known that a strike
to coerce an employer to discharge non-union men has
been held by our courts to be lawful. They have
gone so far as to say that employees may dictate to
employers how their business shall be conducted and
whom they shall employ (*National Protective Associa-
tion* v. *Cumming,* 170 N. Y. 315–324), and that the
employees " have the moral and legal right to say that

they will not work with certain men, and the employer must accept their dictation or go without their services.'' The cited and kindred cases have undoubtedly gone to the extreme limit. But they have never held that citizens may be assaulted and industries or a business destroyed at will. Nor have they gone so far as to say that intimidation followed by felonious assaults is permissible, or that the assaults are justified if a man labors against the union's will. Other jurisdictions have had these questions before them. Picketing has been held unlawful in New Jersey. *George Jonas Glass Co.* v. *Glass Bottle Blowers Assn. of U. S. & Canada,* 72 N. J. Eq. 653; affd., 77 id. 219. In Michigan, no matter how peaceful or orderly it may be. *Beck* v. *Railway Teamsters Union,* 118 Mich. 497; *Clarage* v. *Luphringer,* 202 id. 612. In Illinois (*Barnes* v. *Chicago Typo. Union,* 232 Ill. 402); California (*Pierce* v. *Stablemens Union Local, etc.,* 156 Cal. 70); Ohio (*Otis Steel Co., Limited,* v. *Local Union No. 218 of Cleveland, Ohio,* 110 Fed. Repr. 698); Minnesota (*Knudsen* v. *Benn,* 123 id. 636). In Massachusetts it is not only unlawful, but has been declared to be a nuisance. *Vegelahn* v. *Guntner,* 167 Mass. 92. And in Iowa the same ruling was made. *Atchison, T. & S. F. Ry. Co.* v. *Gee,* 139 Fed. Repr. 582, 584. Among other things, the court in the case last cited said: '' There is and can be no such thing as peaceful picketing, any more than there can be chaste vulgarity, or peaceful mobbing, or lawful lynching. When men want to converse or persuade, they do not organize a picket line. When they only want to see who are at work, they go and see, and then leave, and disturb no one physically or mentally. But such picketing as is displayed in the case at bar by the evidence does, and is intended to, annoy and intimidate. The argument seems to be that anything short of physical violence

is lawful. One man can be intimidated only when knocked down. But the peaceful, law abiding man can be and is intimidated by gesticulations, by menaces, by being called harsh names, and by being followed, or compelled to pass by men known to be unfriendly. Perhaps such a man may not be a bully, but is frail in size and strength, or he may be a timid man; but such a man is just as much entitled to go and come in quiet, without even mental disturbance, as has the man afraid of no one and able with or without weapons to cope with all comers. The frail man, or the man who shuns disturbances, or the timid man, must be protected, and the company has the right to employ such.''

At least a contrast is shown between what our courts have held on the subject of picketing and what the courts of sister states have declared. The cases cited may perhaps be explained or distinguished or even held inapplicable to the instant case, but whether followed or not, the fact remains that they also represent the best thought on a subject that touches the very heart of the body politic.

From the proof submitted, I find myself unable to agree with the argument of counsel for defendants, that the picketing in the case at bar has been as peaceful and as gentle as he would have me believe. The motion to continue the injunction *pendente lite* is granted. The amount of the undertaking to be given will be fixed on the settlement of the order.

Ordered accordingly.